## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
                                        )
CNE DIRECT, INC.,                       )
                                        )
        Plaintiff,                      )
                                        )        Civil No.
        v.                              )        14-10149-FDS
                                        )
BLACKBERRY CORPORATION, f/k/a           )
RESEARCH IN MOTION                      )
CORPORATION, and ASSET RECOVERY         )
ASSOCIATES WORLDWIDE, LTD.,             )
                                        )
        Defendants.                     )
_____)

## MEMORANDUM AND ORDER ON
## BLACKBERRY CORP.'S MOTION FOR SUMMARY JUDGMENT

**SAYLOR, J.**

        This is a contract dispute arising out of an alleged agreement to sell mobile phone

memory parts.  Plaintiff CNE Direct, Inc. has brought suit against defendants BlackBerry Corp.

and Asset Recovery Associates Worldwide, Ltd., alleging that they breached the agreement,

depriving CNE of profit it would have earned from an arranged resale.  Asset Recovery has

defaulted and it is unclear whether it remains in business.  CNE contends that Asset Recovery

was the agent of BlackBerry and that BlackBerry is therefore responsible for the obligation.

CNE has brought claims for breach of contract, breach of the implied covenant of good faith and

fair dealing, and violation of Mass. Gen. Laws ch. 93A.

        BlackBerry has moved for summary judgment.  For the following reasons, that motion

will be granted.

# I.    Background

## A.    Factual Background

### 1.    CNE Direct

CNE Direct, Inc., is a Massachusetts corporation with a principal place of business in

Peabody, Massachusetts.  (Compl. ¶ 3).  Its business is the reverse distribution of technology

hardware.  It purchases new or used excess technology hardware from "large original

manufacturers, original design manufacturers, contract manufacturers, . . . large end users," and

reverse logistics suppliers.  (Latham Dep. 27-28, 31-32).  CNE then sells the excess technology

hardware to "resellers or dealers in markets such as Latin America, India, the UAE, Africa, and

various locations in Asia."  (*Id.* 28-29).

### 2.    BlackBerry

BlackBerry Corporation, formerly known as Research in Motion Corporation ("RIM"), is

a Delaware corporation with a principal place of business in Texas.  (Compl. ¶ 4).[1]  It

manufactures and sells electronic devices, including mobile phones.  (BlackBerry SMF ¶ 1).  It

uses manufacturing partners to make its products.  (Murphy Dep. 33, 45).  The manufacturing

partners buy inventory on BlackBerry's behalf or for themselves and assemble the products.  (*Id.*

45).  BlackBerry then buys the finished products from them.  (*Id.*).

When manufacturing partners have excess inventory, BlackBerry purchases it back from

them.  (*Id.* 45-46).  BlackBerry does not have written protocols or formal procedures that govern

how it handles excess inventory.  (*See id.* 29-30, 47, 52, 58-59).  Rather, it uses an ad hoc

process to evaluate how to dispose of it.  (*Id.*).  Typically, it first takes physical possession of the

---

[1] BlackBerry is the American affiliate of a Canadian corporation, BlackBerry, Ltd.

excess inventory by having it shipped from the manufacturing partner to BlackBerry's warehouse in Cambridge, Ontario.  (*Id.* 46-47).[2]  If the parts are unique to BlackBerry or there is no resale opportunity, BlackBerry will normally scrap the material.  (*Id.* 55).  If not, BlackBerry will try to sell the excess inventory to its manufacturing partners, consignment companies, or customer brokers.  (*Id.* 43-44, 55).

### 3.   Asset Recovery

Asset Recovery Associates Worldwide, Ltd., is a New York corporation with a principal place of business in New York.  (Compl. ¶ 5; Miele Dep. 12).  Stephen Miele is the only employee of Asset Recovery.  (Miele Dep. 14-15).[3]  At the relevant time, Asset Recovery bought and sold "components or anything that is available on the market in distress or excess, or anything that a customer may need that's in [its] location."  (*Id.* 13).  It was "in the business of finding excess inventory or shortages where a manufacturer needs a product and cannot find it in the marketplace and [it] attempt[s] to service either the liquidation of their excess or the supplying to them of their shortage."  (*Id.* 29).  It paid for products it purchases using money that it typically collected in advance from the buyer.  (*Id.* 17-19).  It sometimes, but not always, took physical possession of the products.  (*Id.* 17-20).

As noted, Asset Recovery has defaulted, and it is unclear whether the company remains in business.

---

[2] As of September 10, 2014, the warehouse had moved to Guelph, Ontario.  (*Id.* 47).

[3] Miele was also the owner of STP Global and Olive Works Inc., which no longer exist.  (Miele Dep. 11-12).  In their pleadings, both BlackBerry and CNE use the names STP Global, Olive Works, and Asset Recovery interchangeably.  For the sake of convenience, the Court will adopt the same convention.

4.      **The First Transaction**

In May 2011, Christopher Tejeda, a senior trader at CNE, contacted various companies to try to find excess inventory from major cell phone companies.  (Tejeda Dep. 36-39).  He learned from a contact at Dell Computers that "there was some excess [inventory] available from BlackBerry and that he may have a contact that had that material."  (*Id.* 38-41).  Through LinkedIn, Tejeda discovered that Chris Efstathiou, the Vice President of Global Supply Chain for BlackBerry, was in charge of its excess inventory.  (*Id.* 38-45).  He contacted Efstathiou, who told him that if he wanted to purchase the excess inventory he needed to contact Asset Recovery.  (*Id.* 38-39, 42, 44-45, 47-50, 313-18).  Tejeda then spoke with Stephen Miele of Asset Recovery about purchasing certain liquid crystal display screens ("LCDs").  (*Id.* 50-57).

The first transaction involving BlackBerry, Asset Recovery, and CNE occurred in June 2011.  (*Id.* 79).  To facilitate that transaction, Tejeda spoke with Miele; the BlackBerry shipping department (to arrange pickup); other people in CNE; and CNE's customers.  (*Id.* 61-62).  Miele told Tejeda that he had the exclusive rights to sell excess inventory for BlackBerry; Tejeda then negotiated exclusively with Miele.  (*Id.* 63, 79).  In that transaction, CNE purchased 100,000 LCDs.  (*Id.* 85-86).  The purchase order originally listed "STP Global" as the supplier, specified that funds would be paid directly to BlackBerry, and stated that Asset Recovery acted as the third-party logistics company for BlackBerry.  (Zakarian Aff. Tab E, Ex. 104).  BlackBerry amended the purchase order to change the supplier from STP Global to BlackBerry.  (*Id.*, Exs. 106-07).  Specifically, Sean Murphy e-mailed Miele and directed him to "change the . . . [s]upplier . . . from STP Global to Rim Ltd."  (*Id.*).  As part of that transaction, CNE wired funds directly to BlackBerry.  (Tejeda Dep. 80, 82-83).  Asset Recovery then sent an invoice to

BlackBerry for its commission.  (Miele Dep. 170-71; Murphy Dep. 137-41; Zakarian Aff. Tab.

E., Ex. 108).[4]

### 5.      Subsequent Transactions

After that first transaction, deals continued to occur involving the three parties.  From

June 2011 through November 2013, $1.7 million of excess BlackBerry inventory was sold by

Asset Recovery to CNE.  (Zakarian Aff. Tab E Exs. 44, 170).

The subsequent transactions were, however, structured differently.  In each new

transaction, Asset Recovery collected money from CNE, and BlackBerry collected money from

Asset Recovery.  (Miele Dep. 184-86; Zakarian Aff. Tab. E, Exs. 116, 117, 119).

According to CNE, "[e]ach sale followed a similar pattern."  (Pl. Resp. Def. SMF ¶ 6).

First, BlackBerry e-mailed Asset Recovery the list of inventory that it sought to liquidate.

(Murphy Dep. 230; Zakarian Aff. Tab E, Exs. 67, 68, 140).  Next, Asset Recovery forwarded the

e-mails to CNE to solicit bids.  (Miele Dep. 190; Zakarian Aff. Tab E, Exs. 67, 170, 182).  CNE

placed bids with Asset Recovery for a price per component, and Asset Recovery then presented

those bids to BlackBerry.  (Zakarian Aff. Tab E Ex. 170).  If Asset Recovery told CNE its bid

was accepted, CNE confirmed it with a purchase order. (*See Id.*, Ex. 10).

After issuing a purchase order, CNE received a *pro forma* invoice that confirmed the

exact count of excess inventory.  (*See Id.*, Exs. 7, 8).  The invoice was sent by Asset Recovery

and listed CNE as the purchaser.  (*Id.*; Def. SMF Ex. 6).  CNE then wired funds to Asset

Recovery in payment of the invoice.  (Latham Dep. 112-13).  It appears from the record that

BlackBerry typically sent invoices to Asset Recovery.  (*See* Zakarian Aff. Tab E, Ex. 8; Def.

---

[4] Asset Recovery also submitted a Form W-9 in order to facilitate payment from BlackBerry.  (Miele Dep. 176; Zakarian Aff. Tab. E Ex. 113).

SMF Exs. 4, 5).  For nearly every transaction, CNE picked up the inventory from BlackBerry's warehouse in Ontario.  (Tejeda Dep. 129).

Until August 2013, the purchase orders listed BlackBerry as the supplier.  (*Id.*; Tejeda Dep. 92, 101).[5]  That month, however, Miele instructed Tejeda to change the purchase orders to reflect that Asset Recovery was the supplier.  (*Id.* 92, 101).  The parties appear to have engaged in at least six transactions, involving approximately $735,500 worth of excess inventory, in which Asset Recovery was listed as the supplier.  (*See* Zakarian Aff. Tab E, Ex. 10).

On two occasions, CNE had disputes with Asset Recovery and attempted to contact BlackBerry to resolve the issue.  (Def. SMF Exs. 9, 10).  On both occasions, BlackBerry declined to intervene.  (*Id.*).  First, on August 31, 2012, Tejeda e-mailed Billings to inquire whether Miele was "an exclusive source for excess" inventory by BlackBerry.  (Zakarian Aff., Tab E, Ex. 51).  According to Tejeda, Billings called and told him that he had to deal with Miele. (Tejeda Dep. 133-36, 141-43).  Second, on October 23, 2012, Todd Billings of BlackBerry informed Chris Tejeda of CNE that "the purchase of the LCD's was between you and Stephen [Miele, of Asset Recovery] and that is the form that it should be maintained is it not?  Sorry, but I don't wish to get in the middle between yourself and Stephen as relationships are important to myself and [BlackBerry] as a whole.  I suggest you need to deal on this with Stephen.  I am not sure how else I can help you in this situation Chris."  (Def. SMF Ex. 9).  Shortly thereafter, Tejeda told Miele that CNE's "order [i]s with you, not them."  (*Id.* Ex. 11).

### 6.   The Transaction at Issue

The disputed transaction in this case occurred (or failed to occur) in November 2013.  On

---

[5]   The actual purchase order forms listed "Research in Motion."  (Zakarian Aff. Tab E, Ex. 10).

October 25, 2013, BlackBerry e-mailed Asset Recovery and informed it that BlackBerry was "looking to move" excess memory parts.  (Murphy Dep. 229-30; Zakarian Aff. Tab E, Ex. 67).  Miele forwarded that e-mail to CNE.  On October 31, 2013, Tejeda submitted CNE's initial bid for the inventory.  (Zakarian Aff. Tab E Exs. 67, 170; Def. SMF Ex. 18).  Miele then submitted CNE's bid to BlackBerry.  (*Id.*, Ex. 170).  On November 8, 2013, CNE increased its bid.  (*Id.*; Def. SMF Ex. 19).  On November 12, 2013, BlackBerry informed Miele that it had additional excess parts available.  (Zakarian Aff. Tab E, Exs. 68, 170).  Miele shared the e-mail with CNE, and CNE placed a bid on the additional parts.  (*Id.*, Ex 170).

Tejeda testified that on November 20, 2013, CNE and Asset Recovery reached an agreement on pricing.  (Tejeda Dep. 237, 272-74).  Tejeda sent Miele two purchase orders on November 20, and asked Miele to send him two *pro forma* invoices.  (Zakarian Aff. Tab E, Exs. 16-18).  On November 25, 2013, Miele e-mailed Tejeda that "PART COUNT WILL BE CONFIRM [sic] 11/26.  ANY DEVIATION SHOULD BE MINIMAL.  The P.I. will foll[o]w immediately." (*Id.*, Ex. 154).

On November 27, 2013, CNE President Ed Latham e-mailed Miele and asked,

Can you help me understand what's happening with our agreement to purchase $6,398,000 worth of NAND Flash from Rimm [BlackBerry]?  Your organization accepted our bid and outlined what was required of CNE which included CNE to prepay by wire in full as early as today for a pick up as soon as Friday of this week.  We have met all your requirements and are prepared to execute our wire today.

Stephen, we expect your organization/Rimm to execute on our agreement by issuing proforma invoices, requesting the wire and making the material available for pickup no later than 72 hours after we wire, as agreed.  Failure to do so will force us to pursue all means necessary to enforce our legal rights.  We need your response in writing by noon today, eastern standard time.

(*Id.*, Ex. 26).  Later that day, Miele sent an e-mail to Tejeda that stated "Your invoice is attached.

Please remit payment at your earliest convenience." (*Id.*, Ex. 12).  The *pro forma* invoice listed

the total price as $6,519,130, which amounted to an apparent increase in price of $120,000.

(*Id.*).  Tejeda sent Miele amended purchase orders reflecting the new price.  (*Id.*, Exs. 12, 164).

In the e-mail, Tejeda wrote, "[p]lease confirm product is new and matches all our requirements

as per PO." (*Id.*, Ex. 12).  Asset Recovery forwarded the purchase orders to BlackBerry.  *Id.*, Ex.

165).  Shortly thereafter, Miele sent Tejeda an e-mail that read as follows:

> Chris this message is really for E[d Latham].
>
> Ed I want to thank you for comprehending the situation, I can not be blameless but
> I can be better.  I did no favor for you or Rim in this transaction.  I have the model
> of the pricing attached and I hope it can work for you and your clients I have no part
> in financially and can only hope that it can be worked out.
>
> I will facilitate this order if it should come to pass and I will be at your disposal at
> any time.

(*Id.*, Ex. 31).  The total price in the attached "model" was $8,198,000.  (*Id.*).

Up until that point, CNE had never directly contacted anyone at BlackBerry with respect

to the transaction.  Latham of CNE then e-mailed Sean Murphy of BlackBerry, with a copy to

Stephen Miele.  In the e-mail, he wrote:

> I am writing to bring a very serious matter to your attention.  As you know, a few
> weeks ago, Research in Motion ("RIM") put certain excess inventory up for bid (the
> "Inventory") through its exclusive broker, Asset Recovery, Ltd. ("AR").  CNE
> Direct, Inc. ("CNE") successfully bid on the Inventory (total price $6,398,500) so
> that CNE could resell it to its customers overseas.  Thereafter, CNE issued Purchase
> Orders 7737 and 7738 for the Inventory, which RIM accepted.  Yesterday, Stephen
> Miele at [Asset Recovery] informed CNE that RIM would be issuing Pro Formas this
> morning and expecting prepayment in full (*i.e.*, $6,398,500) by wire transfer today.
> Today, Stephen informed CNE to hold off on wiring the funds so that RIM could
> have some time to sort out some "internal issues."  Stephen, however, assured CNE
> that RIM was not trying to back out of the deal and that CNE would get the
> Inventory.  I explained our concern because CNE already had made commitments
> to its customers, accepted their down payments, and borrowed funds at unfavorable
> rates in order to be in a position to pay RIM.  Stephen told me that he was speaking

with you and that he would get back to me.

About fifteen minutes ago, Stephen informed me that RIM was not going to sell CNE the parts unless CNE agreed to pay an additional $1.8 million more than the contract price. Quite frankly, I was floored. This is not how CNE does business and I cannot believe that it is how RIM does either. Indeed, lulling CNE into a position of weakness and then using that weakened position to extract price concessions is unscrupulous, immoral and unfair. So I am reaching out to you to urge you to do the right thing. Otherwise, CNE will suffer considerable harm (e.g., lost profits, loss of goodwill, out of pocket expenses, etc.), for which RIM will be liable. Please call me so that we can discuss this matter and get this deal back on track. If you would prefer, we can have our respective attorneys participate in the call as well.

(*Id.*, Ex. 33). BlackBerry contends that it declined to "communicate with . . . Latham or CNE regarding the inventory at issue in this matter because CNE was not BlackBerry's customer." (Def. SMF Ex. 31, Murphy Aff. ¶ 5).

CNE never sent the funds to Asset Recovery and never received the inventory. Apparently, in reliance on the alleged agreement with Asset Recovery, CNE had made commitments to sell the inventory to its own customers. (*See* Def. SMF Ex. 22; CNE SMF ¶ 11).

## 7.     BlackBerry's Relationship with Asset Recovery

The exact nature of the relationship between BlackBerry and Asset Recovery is central to this dispute. BlackBerry characterizes Asset Recovery as simply "one of the independent brokers to whom [it] has put its excess parts out to bid." (BlackBerry SMF ¶ 2). CNE, however, contends that Asset Recovery was BlackBerry's agent, and therefore it had the authority, actual or apparent, to bind BlackBerry.

BlackBerry contends that it never told CNE that CNE was its customer, or that Asset Recovery was its agent or representative, or that Asset Recovery had the authority to bind it. (Def. SMF ¶ 8 (citing Tejeda Dep. 144-50; Latham Dep. 84-85; Def. SMF Ex. 33)). Although

9

CNE disputes that contention, it has pointed to no direct evidence to the contrary.  Instead, CNE

relies on a variety of indirect evidence that it contends proves the existence of an agency

relationship.

Among other things, CNE contends that "BlackBerry and Asset Recovery had an

agreement whereby, in exchange for a five percent . . . commission, Asset Recovery would help

BlackBerry liquidate its excess and obsolete inventory by finding customers and negotiating

pricing for BlackBerry."  (CNE SMF ¶ 2).  CNE points to three e-mails from Asset Recovery as

evidence of that alleged agreement:

> Our confidentiality agreement covers the transfer cost which according to our letter
> dated June 6, 2011, we (STP) [that is, Asset Recovery] will find the users and
> negotiate the final participation.  When we have pricing power we will divide the
> compensation above the agreed upon pricing. (Zakarian Aff. Tab E, Ex. 114 (July
> 6, 2011 e-mail from Stephen Miele to Sean Bartley of BlackBerry)).

> My agreement with [BlackBerry] is to reveal customers and selling price we
> basically work on 5%.  So when the prices are higher it is passed along to
> [BlackBerry], that is the deal we signed up for.  (*Id.*, Ex. 129 (July 30, 2012 e-mail
> from Miele to Todd Billings of BlackBerry)).

> This is an [A]sset[] [R]ecovery account and BlackBerry has agreed to pay us 5% if
> they do business with the customers we reveal.  (*Id.*, Ex. 137 (December 16, 2013
> e-mail from Miele to Amazon Services and Andrew Knott)).

CNE also identifies four more e-mails between BlackBerry and Asset Recovery that it

contends "describe Asset Recovery's role as helping BlackBerry sell its excess inventory."  (Pl.

Resp. Def. SMF ¶ 3).

> You [BlackBerry] will not be embarrassed to have [Asset Recovery] help move
> surplus.  (*Id.*, Ex. 94 (April 4, 2011 e-mail from Miele to Efstathiou)).

> I'd like to set up a meeting to find out if there could be further parts that Asset
> Recovery could help RIM [BlackBerry] in selling off excess inventory.  (*Id.*, Ex. 125
> (July 4, 2012 e-mail from Billings to Miele)).

We have the following memory available for sale, can you check if you have any customers, we can offer around 100k?  (*Id.*, Ex. 138 (August 22, 2013 e-mail from Sean Murphy of BlackBerry to Miele)).

That does not mean that I have to sell every part but that I will tell you when I can't and when someone else does I will tell you if the price is legit.  (*Id.*, Ex. 136 (November 13, 2013 e-mail from Miele to Billings)).

### B.      Procedural History

On January 21, 2014, CNE filed the complaint in this action.  It alleges claims for breach of contract, breach of the covenant of good faith and fair dealing, and violation of Chapter 93A.

The Court entered a default against Asset Recovery on September 23, 2014.  On October 20, 2014, CNE moved for default judgment as to Asset Recovery.  The Court granted the motion on October 28, 2014.

On December 2, 2014, BlackBerry filed the motion for summary judgment.

## II.     Legal Standard

The role of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."  *Mesnick v. General Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991) (internal quotation marks omitted).  Summary judgment is appropriate when the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "Essentially, Rule 56[] mandates the entry of summary judgment 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'"  *Coll v. PB Diagnostic Sys.*, 50 F.3d 1115, 1121 (1st Cir. 1995) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).  In making that determination, the court must view "the record in the light most favorable to the nonmovant,

drawing reasonable inferences in his favor." *Noonan v. Staples, Inc.*, 556 F.3d 20, 25 (1st Cir.

2009). When "a properly supported motion for summary judgment is made, the adverse party

'must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson v.

Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56(e)). The non-moving

party may not simply "rest upon mere allegation or denials of his pleading," but instead must

"present affirmative evidence." *Id*. at 256-57.

## III.   Analysis

BlackBerry has moved for summary judgment on the ground that Asset Recovery was

not its agent, and therefore, BlackBerry cannot be held liable for the contract that CNE alleges it

entered into with Asset Recovery. "An agency relationship is created when there is mutual

consent, express or implied, that the agent is to act on behalf and for the benefit of the principal,

and subject to the principal's control." *Theos & Sons, Inc. v. Mack Trucks, Inc.*, 431 Mass. 736,

742 (2000). There are three essential characteristics of an agency relationship: (1) the power of

the agent to alter the legal relationships between the principal and third parties and the principal

and himself; (2) the existence of a fiduciary relationship of the agent toward the principal as to

matters within the scope of the agency; and (3) the right of the principal to control the agent's

conduct as to matters within the scope of the agency. *Canney v. City of Chelsea*, 925 F. Supp.

58, 64 (D. Mass. 1996) (citing Restatement (Second) of Agency §§ 12-14 (1958)). As to the

third characteristic, the principal need not in fact exercise that control; the crucial inquiry is

whether it has a right to control. *Id.* Whether an agency relationship exists is a question of fact

for the jury, but a court may find that no such relationship exists if there is no genuine issue of

material fact. *Id.* at 742; *White's Farm Dairy, Inc. v. De Laval Separator Co.*, 433 F.2d 63, 66

(1st Cir. 1970).

A principal may be held directly liable for the actions of its agent toward third parties "if the agent was acting with the actual or apparent authority of the principal in that transaction." *Theos & Sons*, 431 Mass. at 743 (citing Restatement (Second) of Agency §§ 7, 8 (1958)).  CNE contends that "the evidence shows that (1) Asset Recovery had actual and apparent authority to negotiate for BlackBerry; and (2) BlackBerry ratified Asset Recovery's conduct."  (CNE Opp. 1).

A.    **Actual Authority**

CNE contends that Asset Recovery had actual authority because BlackBerry and Asset Recovery expressly agreed that Asset Recovery would serve as BlackBerry's agent. Specifically, CNE contends that "BlackBerry and Asset Recovery expressly agreed that Asset Recovery would locate customers and negotiate sales for BlackBerry in exchange for a five percent commission."  (CNE Opp. 1).

"Actual authority . . .  is the agent's power to affect the principal's relations with third parties as manifested to the agent by the principal."  *Theos & Sons*, 431 Mass. at 743-44 (citing Restatement (Second) of Agency, § 7 (1958)).  Actual authority can be express or implied.  *Id.* at 743 n.13.  Express authority "results when the principal explicitly manifests consent, either through words or conduct, that the agent should act on behalf of the principal."  *Id.* (citing *Commonwealth Aluminum Corp. v. Baldwin Corp.*, 980 F. Supp. 598, 611 (D. Mass. 1997); Restatement (Second) of Agency, § 7).  "Implied authority is actual authority that evolves by implication from the conduct of the parties."  *Id.* (citing *T.D. Downing Co. v. Shawmut Corp.*, 245 Mass. 106, 113 (1923) (explaining that "relation of principal and agent may arise wholly by

13

implication from the conduct of the parties and the circumstances of the particular case")).

CNE points to three e-mails between Miele and BlackBerry that it contends are evidence of an express agreement authorizing Asset Recovery to locate customers and negotiate prices for BlackBerry.  (*See* Zakarian Aff. Tab E, Exs. 114, 129, 137).  No actual agreement is included in the record; instead, CNE relies entirely on Miele's statements.

All three of those e-mails, however, originated from Miele, the representative of the alleged agent.  They were not statements of Blackberry, and there is no evidence that BlackBerry ever accepted or acknowledged the fact that Miele's e-mails set forth the terms of any agreement between the parties.  (*Id.*).  In the e-mails, Miele appeared to refer to an agreement whereby Asset Recovery would reveal the names of interested customers to BlackBerry, and that if BlackBerry did business with those customers, BlackBerry would pay Asset Recovery five percent of the business they did with them.  (*Id.*).  In fact, however, Miele himself testified that no such agreement with those terms was ever created.  (Miele Dep. 50-60).  And even if there was an agreement wherein BlackBerry agreed to pay Asset Recovery a five percent commission for locating customers, nothing in the record supports a finding that Asset Recovery had actual authority to bind BlackBerry.  As BlackBerry notes, the evidence at most would establish that Asset Recovery was entitled to a 5% finder's fee in the event that BlackBerry did business with a customer identified by Asset Recovery.[6]

---

[6] Asset Recovery received a five percent "service charge" or "commission" in the first transaction in June 2011 between BlackBerry, Asset Recovery, and CNE.  That was the sole transaction where CNE paid BlackBerry directly.  In that transaction, BlackBerry paid Asset Recovery the difference between the price it charged Asset Recovery and the price Asset Recovery charged CNE (and CNE paid BlackBerry).  (*See* Zakarian Aff. Tab E, Ex. 114 ("Just wanted to clarify regarding the attached invoice.  If I understand correctly the original [purchase order] to [BlackBerry] was made out for $1.05 per unit however it should have been $1.00 to RIM and 5% Service Charge to [Asset Recovery].  With the attached invoice there is now a 5% Service Fee on top of the $1.05 unit cost for a total of $5,250.  To rectify this issue how would you like us to proceed[?]")).

CNE also contends that BlackBerry "repeatedly directed CNE to deal with Asset Recovery in purchasing excess inventory from BlackBerry." (CNE Opp. 13). CNE relies on conversations with BlackBerry representatives in June 2011, August 2012, and October 2012. However, those conversations are not proof of an agreement between BlackBerry and Asset Recovery; the relevant words or conduct to establish *actual* authority are necessarily those occurring between the principal and agent. The words or conduct of BlackBerry toward CNE are, at most, relevant to the issue of apparent authority, which is addressed below.

CNE further contends that an actual agency relationship was established by the course of dealing, particularly the fact that Asset Recovery negotiated the sale of $1.7 million in excess BlackBerry inventory to CNE over a two-and-a-half year period. It contends that BlackBerry was listed as the seller in the first transaction, and that in "every deal thereafter, . . . , CNE picked up the inventory directly from BlackBerry." (CNE Opp. 13-14). Although it is true that BlackBerry was listed as the seller in the first transaction, there are several problems with CNE's contention. First, in the transaction at issue here, Asset Recovery was clearly designated as the seller and supplier. (Def. SMF Exs. 6, 12, 21, 22, 27). Second, CNE only paid BlackBerry directly in the first transaction. (Tejeda Dep. 80-83). For every transaction after the first, CNE paid Asset Recovery and Asset Recovery paid BlackBerry. (Zakarian Aff. Tab E, Ex. 7, 8; Latham Dep. 112-13). Third, although BlackBerry was listed as the supplier until August 2013, for every transaction—and there were at least six—that occurred after August 2013, Asset Recovery was listed as the supplier. (Zakarian Aff. Tab E, Ex. 10).

Under the circumstances, the parties' course of dealing does not provide sufficient evidence to draw the inference that there was an actual agency relationship between the parties.

Rather, the undisputed evidence compels the conclusion that Asset Recovery was a customer of

BlackBerry that resold its excess inventory, and that BlackBerry did not consent to Asset

Recovery serving as its agent.

### B.   <u>Apparent Authority</u>

CNE further contends that "BlackBerry's [w]ords and [c]onduct [c]loaked Asset

Recovery with [a]pparent [a]uthority."  Under Massachusetts law, "[a]pparent authority, is

'created as to a third person by written or spoken words or any other conduct of the principal

which, reasonably interpreted, causes the third person to believe that the principal consents to

have the act done on his behalf by the person purporting to act for him." *Theos & Sons*, 431

Mass. at 745 (quoting Restatement (Second) of Agency, § 27); *accord Haufler v. Zotos*, 446

Mass. 489, 497 n.22 (2006).  Apparent authority "is not established by the putative agent's

words or conduct, but by those of the principal."  *CSX Transp., Inc. v. Recovery Express, Inc.*,

415 F. Supp. 2d 6, 10 (D. Mass. 2006) (quoting *Rubel v. Hayden, Harding & Buchanon, Inc.*, 15

Mass. App. Ct. 252, 255 (1983)).  "Apparent authority exists only if the plaintiff reasonably

relied on the principal's words or conduct at the time he entered the transaction that the agent is

authorized to act on the principal's behalf."  *Theos & Sons*, 431 Mass. at 745 (citing *Commercial

Credit Corp. v. Stan Cross Buick, Inc.*, 343 Mass. 622, 626 (1962)).

In *Theos & Sons*, 431 Mass. at 742, a plaintiff argued that the defendant manufacturer

was vicariously liable for a dealer's actions because the dealer "as an authorized parts and

service dealer, had actual, or at least apparent, authority to work on the truck engine on behalf

of" the manufacturer.  The plaintiff relied on the following facts as evidence of apparent

authority:  (1) the manufacturer's logos appeared on the dealer's invoices; (2) the manufacturer's

logos were displayed at the dealer's place of business; (3) the dealer was required to display the approved signs; and (4) the dealer stated to the plaintiff that it was an "authorized parts and service dealer of" the manufacturer.  *Id.* at 745-46.  The Supreme Judicial Court found that "[a]lthough the question of agency is usually an issue for the fact finder, . . . [t]he mere use of a trademark and other logos of the defendant is not sufficient to raise a genuine issue of material fact that the defendant cloaked [the dealer] with apparent authority."  *Id.* at 742, 746.

Here, CNE relies on three arguments to support its contention that Asset Recovery had apparent authority:  (1) "BlackBerry placed Asset Recovery in charge of selling its excess inventory to CNE"; (2) the parties "had a two and a half year course of dealing whereby Asset Recovery . . . solicit[ed] bids from CNE"; and (3) "BlackBerry repeatedly directed CNE to deal with Asset Recovery."  (CNE Opp. 15).  The Court will address those arguments in turn.

First, the undisputed evidence indicates that in the November 2013 transaction at issue, BlackBerry notified Asset Recovery about the existence of its excess inventory, and Asset Recovery offered to sell the excess inventory to CNE.  Unlike *Theos & Sons*, none of the purchase orders or invoices relating to the November 2013 transaction at issue either contained BlackBerry's logo or company name, or otherwise indicates BlackBerry's role in the transaction. There do not appear to be any communications by BlackBerry indicating or suggesting that BlackBerry had placed Asset Recovery in charge of selling the excess inventory in the transaction at issue.  An October 25, 2013 e-mail from Murphy of BlackBerry to Miele of Asset Recovery informed Miele that BlackBerry was "looking to move" excess memory parts. (Murphy Dep. 229-30; Zakarian Aff. Tab E, Ex. 67).  On November 12, 2013, BlackBerry informed Miele that it had additional excess parts available.  (*Id.* Exs. 68, 170).  On November

13, 2013, Billings of BlackBerry and Miele of Asset Recovery had an e-mail exchange in which Miele appeared to request additional information about the excess inventory.  (*See id.*, Ex. 136). But there are no other e-mails that contain communications from BlackBerry relating to the November 2013 transaction.  As a result, nothing in the record supports a finding that BlackBerry placed Asset Recovery in charge of moving the excess parts with respect to the transaction at issue.  Instead, the undisputed evidence shows that BlackBerry simply notified Asset Recovery that it had excess inventory available.

Second, CNE contends that apparent authority is not transaction-specific and, therefore, the Court should not limit its review of the evidence to BlackBerry's statements and conduct occurring from October 25 to November 27, 2013.  (CNE Opp. 16).  It contends that under Massachusetts law, "apparent authority can be based on 'statements, conduct, *course of dealing*, and other manifestations of the principal's consent . . . ."  (*Id.* (quoting *Binkley Co. v. Eastern Tank, Inc.*, 831 F.2d 333, 337 (1st Cir. 1987)).  CNE's contention is correct as a matter of law. However, the facts simply do not support a finding that Asset Recovery had apparent authority based on a course of dealing.  It is true that in the initial transaction in 2011, CNE directly paid BlackBerry for the inventory, and BlackBerry paid Asset Recovery.  However, with respect to every transaction after the initial one, Asset Recovery issued invoices to CNE, and BlackBerry issued invoices to Asset Recovery.  As a result, Asset Recovery paid BlackBerry for the excess inventory, and CNE paid Asset Recovery.  Furthermore, since August 2013, CNE and Asset Recovery engaged in at least six transactions—involving approximately $735,000 worth of excess inventory—in which Asset Recovery, and not BlackBerry, was listed as the supplier. Except with respect to the initial transaction, the course of dealing shows that Asset Recovery

18

was not the agent of BlackBerry, but an independent actor.  One single transaction cannot create a "course of dealing"—especially when it is followed by six transactions with different terms and  structure.

The fact that BlackBerry directed CNE to deal with Asset Recovery does not alter the analysis.  There are only three instances in which CNE and BlackBerry directly communicated. First, in May 2011, Christopher Tejeda of CNE contacted Chris Efstanthiou of BlackBerry, who told Tejeda that if he wanted to purchase excess inventory, he needed to contact Asset Recovery. Second, in August and October, 2012, BlackBerry declined to intervene when CNE had disputes with Asset Recovery and attempted to contact BlackBerry.  Todd Billings of BlackBerry specifically informed Tejeda that "the purchase of the LCD's was between you and Stephen [Miele, of Asset Recovery] and that is the form that it should be maintained is it not?  Sorry, but I don't wish to get in the middle between yourself and Stephen as relationships are important to myself and [BlackBerry] as a whole.  I suggest you need to deal on this with Stephen.  I am not sure how else I can help you in this situation . . . ."  (Def. SMF Ex. 9).  Tejeda followed up with Miele and appeared to acknowledge that CNE's "order [i]s with you [Asset Recovery], not them [BlackBerry]."  (*Id.* Ex. 11).

BlackBerry's direction to CNE to deal with Asset Recovery is entirely consistent with the conclusion that BlackBerry sold excess inventory to Asset Recovery.  There is no evidence that BlackBerry ever told CNE that it was BlackBerry's customer.  To the extent that CNE relies on Miele's apparent statement that Asset Recovery had the exclusive rights to sell excess inventory for BlackBerry, (Tejeda Dep. 63), that statement cannot create a genuine dispute of material fact on the question of apparent authority because the statement did not come from BlackBerry.  *See*

19

*CSX Transp.*, 415 F. Supp. 2d at 10 (explaining that apparent authority "is not established by the putative agent's words or conduct, but by those of the principal").  Likewise, to the extent that CNE relies on the fact that Miele forwarded e-mails from BlackBerry to CNE, that action by the alleged agent does not create a genuine dispute of material fact.[7]

The cases cited by CNE in support of its claim of apparent authority are readily distinguishable.  All involved situations in which an employee, officer, or other undisputed agent signed a contract on behalf of an entity.  *See, e.g.*, *Lowell Housing Authority v. PSC Intern, Inc.*, 692 F. Supp. 2d 180 (D. Mass. 2010) (denying housing authority motion for summary judgment where question was whether a deputy director of the Lowell Housing Authority had the authority to bind the housing authority to a contract); *Murphy & McManus, LLC v. CBR Institute for Biomedical Research, Inc.*, 2013 WL 1403299 (Mass. App. Ct. 2013) (examining whether executive vice president of defendant had apparent authority to bind defendant in contract with plaintiff); *Chedd-Angier Production Co. v. Omni Publications International, Inc.*, 1984 WL 478431 (D. Mass. 1984) (finding that sufficient evidence existed for a jury to find that agent enlisted by defendant to contact certain producers had apparent authority to bind defendant to contract with plaintiff production company); *Kanavos v. Hancock Bank & Trust Co.*, 14 Mass. App. Ct. 326 (finding that evidence would have supported a finding that bank's executive vice president had apparent authority to modify agreement with plaintiff borrower).  The relevant question in those cases was whether an agent had authority to bind its principal to a specific transaction.  Here, the facts do not support a finding of any principal-agent relationship between

---

[7] With respect to the transaction at issue, CNE's first conversations with BlackBerry occurred only after the time when it alleges Asset Recovery had breached the alleged agreement.  The first correspondence between CNE and BlackBerry occurred on November 27, 2013, when Ed Latham e-mailed Sean Murphy of BlackBerry.  (*See* Zakarian Aff. Tab E, Ex. 33).  BlackBerry did not respond to Latham's e-mail.

BlackBerry and Asset Recovery, and therefore, the cases cited by CNE are inapposite.

Accordingly, "although the question of agency is usually an issue for the fact finder," CNE has "failed to advance specific facts sufficient to establish the existence of a genuine issue of material fact as to [Asset Recovery's] actual or apparent authority to act on behalf of [BlackBerry]." *Theos & Sons*, 431 Mass. at 742.

### C.   Ratification

Finally, CNE contends that even if Asset Recovery initially lacked actual authority, BlackBerry ratified its actions and therefore may nonetheless be bound.  Under Massachusetts law, "[w]here an agent lacks actual authority to agree on behalf of his principal, the principal may still be bound if the principal acquiesces in the agent's action or fails promptly to disavow the unauthorized conduct after disclosure of material facts."  *Licata v. GGNSC Malden Dexter LLC*, 466 Mass. 793, 802 (2014) (quoting *Linkage Corp. v. Trustees of Boston Univ.*, 425 Mass. 1, 18 (1997)).  "Ratification must be based upon full knowledge of all material facts, subject, however, to the qualification that there may be ratification when one purposely shuts his eyes to means of information within his own possession and control, and ratifies an act deliberately."  *Id.* (quoting *Kidder v. Greenman*, 283 Mass. 601, 615 (1933)).

Here, there are insufficient facts in the record to support a finding that BlackBerry either had "full knowledge of all material facts" or "purposely shut [its] eyes to means of information" with respect to the transaction at issue.  Again, BlackBerry and Asset Recovery did not have a principal-agent relationship, and BlackBerry never had any reason to "disavow" conduct by Asset Recovery.  With respect to the transaction at issue, CNE did not communicate with BlackBerry until after Asset Recovery allegedly breached the alleged contract.

Therefore, BlackBerry cannot be held liable for the contract that CNE alleges it entered into with Asset Recovery.  Accordingly, BlackBerry's motion for summary judgment will be granted.

**IV.**     **<u>Conclusion</u>**

For the foregoing reasons, the motion of defendant BlackBerry Corporation for summary judgment is GRANTED.

**So Ordered.**

/s/ F. Dennis Saylor_____
F. Dennis Saylor IV

Dated: August 10, 2015                     United States District Judge